**In re WHEELING–PITTSBURGH STEEL CORPORATION, et al., Debtor.**

**Bankruptcy No. 85–793 PGH.**

United States Bankruptcy Court, W.D. Pennsylvania.

July 17, 1985.

As Amended Oct. 22, 1985.

John J. McLean, Jr., Samuel Braver and M. Bruce McCullough, Buchanan & Ingersoll, P.C., and George Raynovich, Jr., Wheeling-Pittsburgh Steel Corp., Pittsburgh, Pa., for debtor-in-possession.

Michael H. Gottesman and Gary L. Sasso, Bredhoff & Kaiser, Washington, D.C., and Claude D. Montgomery, Booth, Marcus & Pierce, New York City, for United Steelworkers of America, AFL–CIO–CLC.

Joel M. Walker, Pollard & Walker, Pittsburgh, Pa., Warren R. Stern, Thomas Moers Mayer, Dennis F. Cronin, Wachtell, Lipton, Rosen & Katz, New York City, for principal banks.

Michael J. Yurcheshen, Yurcheshen & Baggett, Pittsburgh, Pa., and Harvey R. Miller, Weil, Gotshal & Manges, New York City, for Prudential Life Ins. Co., et al.

Robert G. Sable and Scott Gray, Lampl, Sable, Makoroff & Libenson, Pittsburgh, Pa., and Barbara Kaplan, Stroock, Stroock & Lavan, New York City, for Official Committee of Unsecured Creditors.

Roger J. Lerner of and for the Pension Benefit Guar. Corp., Washington, D.C.

## MEMORANDUM OPINION ON MOTION UNDER § 1113

WARREN W. BENTZ, Bankruptcy Judge.

### Case Summary

Wheeling-Pittsburgh Steel Corporation ("Wheeling-Pittsburgh" or the "Company") filed for relief under Chapter 11 of the Bankruptcy Code on April 16, 1985.[1] On May 31, 1985, Wheeling-Pittsburgh filed the instant motion under 11 U.S.C. § 1113 for authority to reject its collective bargaining agreements with the United Steelworkers of America (the "Union"). Having considered the testimony and documentary evidence adduced at the hearing, the statements and arguments of counsel, and the briefs of the parties, the court finds that Wheeling-Pittsburgh has established by a preponderance of the evidence the necessary prerequisites for rejection of its collective bargaining agreements under § 1113. Accordingly, and for the reasons discussed below,[2] the court will authorize the Company's rejection of its collective bargaining agreements with the Union and enter an appropriate order.

### Jurisdiction

This court has jurisdiction over the parties and subject matter of this action under

---

1. Seven subsidiary companies filed for relief under Chapter 11 simultaneously, and the proceedings have been consolidated for administrative purposes. This § 1113 proceeding, however, relates only to collective bargaining agreements between Wheeling-Pittsburgh and the United Steelworkers of America.

2. This Memorandum Opinion constitutes this court's findings of fact and conclusions of law as required by Bankruptcy Rule 7052 as made applicable to this contested matter by Bankruptcy Rule 9014.

28 U.S.C. § 1334 and the General Order of Reference of the United States District Court for the Western District of Pennsylvania dated October 16, 1984 entered pursuant to 28 U.S.C. § 157. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

### Background

The debtor-in-possession, Wheeling-Pittsburgh, is the seventh largest steel manufacturing corporation in the United States. Approximately 8,500 of Wheeling-Pittsburgh's employees have the terms and conditions of their employment embodied in several collective bargaining agreements between Wheeling-Pittsburgh and the Union. The collective bargaining history of Wheeling-Pittsburgh and the Union is relevant to the resolution of the instant motion, and therefore will be reviewed in some detail.

Beginning in the late 1970s, Wheeling-Pittsburgh embarked upon a major capital investment program for modernization. From 1980 to 1985 the Company spent some 540 million dollars to meet customer demands for better quality and service, and to achieve cost reductions in an attempt to remain competitive against foreign and domestic producers. However, to achieve this modernization, the Company had to borrow heavily, and the obligation to pay interest and repay principal on these loans, combined with "significant 1982, 1983 and 1984 losses ... substantially weakened the Corporation's financial position." (W–P Ex. 11, p. 16).

In 1980–81, in an attempt to weather these financial difficulties, Wheeling-Pittsburgh asked for certain concessions from the employees of the Allenport plant. This was the first time the Company approached the Union for concessions during the pendency of a collective bargaining agreement, and the parties successfully reached an accord.

In 1982, Wheeling-Pittsburgh asked the Union for further concessions in an attempt to deal with deteriorating conditions in the steel industry and within the Company itself. After consulting with its financial experts, who confirmed that Wheeling-Pittsburgh needed help, the Union negotiating committee obtained two rounds of concessions from its members employed at Wheeling-Pittsburgh, one in April of 1982, and the second in December of 1982. The second of these concessions was made as part of a new three and one-half year collective bargaining agreement which is now in effect and scheduled to expire on July 31, 1986. The concessions in that agreement reduced average labor costs initially to $18.60 per hour, with a schedule of restorations during the life of the agreement that would, by its end, restore average labor costs to the $25 level.[3] By the end of 1984, there had been restorations raising the labor cost to $21.40.

In November of 1984, Wheeling-Pittsburgh advised the Union that its financial condition had worsened, and asked the Union to cancel the anticipated restorations above $21.40. After again seeking the advice of its financial advisors, who again confirmed Wheeling-Pittsburgh's distressed financial condition, the Union agreed to defer restorations indefinitely, subject to reimposition on short notice, thereby maintaining the labor cost at the current $21.40 level.

On January 15, 1985, Wheeling-Pittsburgh, stating that its financial position was weaker still, asked the Union for yet another concession. The Union took the position that it would make no further concessions until the Company first secured concessions from its lenders. In response, the Company issued a three-prong restruc-

---

**3.** Under the terms of the 1980–83 collective bargaining agreement, Wheeling-Pittsburgh's labor costs were approximately $25 per hour. This $25 per hour figure is a gross figure encompassing total labor costs including numerous components other than wages. The figure includes all fringe benefits and government required payroll costs. In addition, a portion of this figure represents the current cost of pensions and other benefits for retirees, money which is not part of the earnings of current employees. The figure is an average labor cost. Some workers have wages and benefits that exceed this figure; others have wages and benefits that fall below it.

turing proposal (later to be known as the "three-legged stool") on March 8, 1985. This restructuring proposal sought concessions from three groups: the lenders, the Union and the shareholders. As the price for making their concessions, the lenders insisted that Wheeling-Pittsburgh pledge all of its current assets to secure the Company's old debt. The Union, on the advice of its financial consultants, insisted as a condition of further wage concessions that the Company *not* pledge its current assets as additional collateral for old debt. The Company was unable to accommodate the diametrically opposed demands of the Union and the lenders on this issue, and the March 8 restructuring proposal failed.

On April 16, 1985, Wheeling-Pittsburgh filed its Chapter 11 petition. On May 9, 1985, the Company made a new proposal to the Union seeking deeper labor concessions, the essentials of which were a reduction in overall wage costs to $15.20 per hour for a 5 year contract term. On May 31, 1985, the Company filed the instant motion to reject its collective bargaining agreements with the Union, and a hearing was held on June 17, 18, 20 and 21.

**4.** Section 1113 provides in relevant part:
(a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter (11 USCS §§ 1101 et seq.], other than a trustee in a case covered by subchapter IV of this chapter [11 USCS §§ 1161 et seq.] and by title I of the Railway Labor Act [45 USCS §§ 151 et seq.], may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.
(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—
(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and
(B) provide, subject to subsection (d)(3), the representative of the employees with such rel-

### Discussion

■ Wheeling-Pittsburgh's motion for authorization to reject its collective bargaining agreements is governed by 11 U.S.C. § 1113.[4] Section 1113 was added to Title 11 by the Bankruptcy Amendments and Federal Judgeship Act of 1984 in response to *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).[5] Beginning with *In re American Provision Co.*, 44 B.R. 907, 909 (Bankr.D.Minn.,1984), several courts have found that nine requirements must be met for court authorization to reject a collective bargaining agreement under § 1113. *See In Re Cook United, Inc. et al*, 50 B.R. 561, 563 (Bankr.N.D. Ohio, 1985); *In re K & B Mounting, Inc.*, 50 B.R. 460, (N.D.Ind. 1985); *In re Salt Creek Freightways*, 47 B.R. 835, 838 (Bankr.D.Wyo.1985). Following the lead of these courts, the analysis may be broken down as follows:

### Prior to the § 1113 Hearing

1. The debtor-in-possession must make a proposal to the Union to modify the

evant information as is necessary to evaluate the proposal.
(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.
(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—
(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);
(2) the authorized representative of the employees has refused to accept such proposal without good cause; and
(3) the balance of the equities clearly favors rejection of such agreement.

**5.** For an analysis of the process which led to the creation of § 1113, see *Gibson*, "The New Law on Rejection of Collective Bargaining Agreements in Chapter 11: An Analysis of 11 U.S.C. § 1113," 58 Am.Bankr.L.J. 325 (Fall 1984) [hereafter cited as "Gibson"].

collective bargaining agreement. [1113(b)(1)(A)].

2. The debtor-in-possession then must meet at reasonable times with the Union until the date set for the § 1113 hearing. [1113(b)(2)].

3. At these meetings, the debtor-in-possession must confer in good faith in attempting to reach mutually satisfactory modifications of such agreement. [1113(b)(2)].

### At the § 1113 Hearing

■ The court shall approve the application for rejection only if the court finds that:

4. The proposal was based on the most complete and reliable information available at the time of its creation. [1113(b)(1)(A)].

5. The proposed modifications are necessary to permit the reorganization of the debtor-in-possession. [1113(b)(1)(A)].

6. The proposed modifications assure that all creditors, the debtor-in-possession, and all of the affected parties are treated fairly and equitably. [1113(b)(1)(A)].

7. The debtor-in-possession provided the Union with such relevant information as was necessary to evaluate the proposal. [1113(b)(1)(B)].

8. The Union has refused to accept the proposal without good cause. [1113(c)(2)] and

9. The balance of the equities clearly favors rejection of the collective bargaining agreements. [1113(c)(3)].

■ The debtor-in-possession, as movant, bears the burden of persuasion by a preponderance of the evidence on all nine elements. *In re Salt Creek Freightways*, 47 B.R. at 838; *In re American Provision Co.*, 44 B.R. at 909–10. However, the initial burden of going forward with the evidence does not in all instances rest on the debtor. As was stated in *In re American Provision Co.*, 44 B.R. at 909–10:

In particular, as to elements [3], [7] and 8, I think that to a certain extent the burden of production of evidence should lie with the Union. As to element [7], I think that it is incumbent upon the debtor in the first instance to show what information it has provided to the Union. It is then incumbent upon the Union to produce evidence that the information provided was not the relevant information which was necessary for it to evaluate the proposal. Likewise as to element [3], once the debtor has shown that it has met with the Union representatives, it is incumbent upon the Union to produce evidence that the debtor did not confer in good faith. And lastly as to element 8, once the debtor has shown that the Union has refused to accept its proposal the Union must produce evidence that it was not without good cause. Again, once the Union has come forward with evidence on these three elements, the ultimate burden of persuasion on each still lies with the debtor.

These elements now will be applied to the instant set of facts.

### 1. *Submission of a Proposal*

It is uncontroverted that the Company dated and submitted on May 9, 1985, its proposal for modifications to the current collective bargaining agreement.

### 2. *Meetings with the Union*

The Company met with the Union negotiators on many occasions following its submission of the May 9 proposal and has made itself available up to the conclusion of the § 1113 hearing (June 21, 1985) for further negotiations. No evidence was offered in rebuttal. Accordingly, Wheeling-Pittsburgh has satisfied its burden of proof as to this element.

### 3. *Good Faith Negotiations*

Although the Company and the Union met for negotiations following May 9, 1985, the Union argues that Wheeling-Pittsburgh did not confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement. In particular the Union argues 1)

that the Company waited only three weeks after submitting the May 9 proposal to the Union before filing its § 1113 motion; and 2) that the Company refused to cooperate with the Union's financial experts with regard to the provision of information the Union needed in order to bargain in an informed and constructive manner. These actions, the Union argues, evidence a lack of good faith.

It is first necessary to examine the meaning of "good faith" in the context of § 1113. Section 1113 was a legislative effort to strike a workable compromise between the conflicting policies of the Bankruptcy Code and the National Labor Relations Act. As one commentator has stated:

> On one hand, 11 U.S.C. § 365(a) permits a debtor, with court approval, to reject executory contracts that are burdensome to the estate. This power of rejection is an essential part of the debtor's power to radically reorganize its business affairs in order to avoid liquidation. On the other hand, section 8(d) of the National Labor Relations Act prohibits an employer from unilaterally altering a collective bargaining agreement mid-term without complying with a set of statutory requirements.

■ Gibson at 325–26 (footnotes omitted). Congress apparently did not intend bankruptcy courts to interpret the "good faith" element of § 1113(b)(2) in compliance with labor law precedent. The legislative history to § 1113, scant though it is, supports this conclusion. In particular, Senator Hatch stated that:

> good faith negotiations between the parties ... was a requirement articulated by the Supreme Court in the *Bildisco* case. The conference, once again, preserved the spirit of that Court holding by requiring good faith efforts to confer in an effort to reach an agreement between the business and its union employees.

130 Cong.Rec. S8892 (daily ed. June 29, 1984) (hereafter cited as Congressional Record). *See also* Gibson at 327. The "spirit" of the *Bildisco* holding to which Senator Hatch referred is reflected in the following excerpt from *Bildisco*:

> Before acting on a petition to modify or reject a collective bargaining agreement, ... the Bankruptcy Court should be persuaded that *reasonable efforts to negotiate a voluntary modification have been made* and are not likely to produce a prompt and satisfactory solution ... *that court need not determine that the parties have bargained to impasse or make any other determination outside the field of its expertise.*

*Bildisco,* 104 S.Ct. at 1196–97 (emphasis added). *See also* Gibson at 329. Thus, the "good faith" element in § 1113(b)(2) can be satisfied by showing that the debtor made reasonable efforts to negotiate a voluntary modification, and those efforts were not likely to produce a prompt and satisfactory solution.

■ The Union first argues that the Company's filing of its motion to reject just three weeks after it submitted its proposal indicates that the Company did not take the negotiation process seriously, and therefore did not act in good faith. However, a three week negotiation period by itself is not inherently unreasonable since § 1113 permits the debtor to file its application to reject any time after it submits its proposal. If a debtor filed its motion to reject before the union received the information necessary to evaluate the proposal so that meaningful negotiations could not possibly take place, a court likely would find that the debtor did not approach the negotiations in good faith. However, Wheeling-Pittsburgh did provide the Union with the information necessary to evaluate the proposal, did provide this information in time to conduct meaningful negotiations and did in fact make reasonable efforts to negotiate. Therefore, the Union's argument that the three week negotiation period evidenced a lack of good faith is not well taken.

■ The Union further argues that the Company refused to provide necessary information to the Union's financial experts and this constituted a lack of good faith. Specifically, the Union argues that it made two requests which the Company denied: 1) a plant tour and 2) a review and explana-

tion of the Company's standard wage cost system. The court is not persuaded by this argument.

The Company responses were not unreasonable. First, the Company did not refuse a plant tour, but requested that it be delayed a week or two because of the press of the work effort in assembling the information requested by the Union. Second, it is not disputed that the standard cost system used by the Company had been reviewed with the Arthur Young & Co. personnel during the intensive study of November 1984 to January 1985. A second review with other people from the same organization would have been duplicative.

In view of the foregoing, the court finds that the Company made reasonable efforts to negotiate a voluntary modification of the labor agreement and that those negotiations were not likely to produce a prompt and satisfactory solution. The Company, therefore, has met its burden of proof on the good faith issue.

### 4. Proposal Based on Most Complete Information Available.

The Court finds on uncontradicted testimony that the most complete and reliable information available was used in preparing the proposal. The testimony and exhibits introduced by both parties reveal extensive analysis by both parties of past operations and future projections. This factor is not at issue here.

### 5. Proposed Modifications are Necessary for Reorganization

The collective bargaining agreements that the Company seeks to reject have thirteen months to run and provide for an average hourly labor cost of $25.00, voluntarily reduced by agreement to $21.40. The May 9 proposal would substitute for that agreement a five year agreement providing for an average labor cost in each of those five years of $15.20 per hour. Although the Company's proposal contains eight modifications to the current collective bargaining agreements, the Union has attacked only the $15.20 per hour labor cost

and the proposed five year contract term as being unnecessary.

Three of Wheeling-Pittsburgh's witnesses testified that the $15.20 labor cost and five year contract term both are necessary for the Company to reorganize: Chairman and CEO Carney, Senior Vice-President and Chief Financial Officer Rose, and Senior Vice-President for Industrial Relations Scalise. In addition, Nicholas John Sakellariadis, First Vice-President in the Corporate Finance Department of E.F. Hutton Company, who assisted Wheeling-Pittsburgh in the preparation of the May 9 proposal, also testified that both the $15.20 labor rate and five year contract term were necessary to the Company's reorganization. In response, the Union offered the testimony of its experts to show that (1) no modifications of the existing collective bargaining agreement are necessary; and (2) in any event, the particular modifications that the Company proposes are not necessary for reorganization.

In support of its position that no modifications of the existing contract are necessary, the Union first posits that honoring the existing contract could threaten reorganization only if paying the contractual labor costs (through the end of the contract period) would deny Wheeling-Pittsburgh the cash required to meet the Company's operational needs. The Union then adduced evidence to show that Wheeling-Pittsburgh would have sufficient cash balances *throughout the contract term* to meet current operational needs if the Company continued to pay the contractual labor rate. From this the Union concludes that the current contract rate does not threaten reorganization, and therefore no proposed modification of the contractual labor rate is necessary.

It must be observed that the only reason the Company is in business today is that its cash has been protected and regenerated by the protections against creditors afforded by the bankruptcy laws. The cash availability is created by freezing the status of creditors who ought to be paid in the ordinary course of business. This factor, and

the plight of creditors so held at bay, cannot be overlooked in determining what is necessary to achieve a reorganization.

 Assuming *arguendo* that the Company could continue to pay the contract rate and still have enough cash on hand at the expiration of the collective bargaining agreement to meet its current operational needs, those facts do not resolve the relevant issue. The Union concedes as much when it emphasizes that:

> The initial question posed by § 1113 is not whether the existing collective agreement (sic) needs to be modified but whether the contract modifications *proposed* by the debtor are "necessary to permit reorganization" (emphasis in original). *The statutory focus is thus on the terms of the debtor's proposal, not on the terms of the existing agreement.* (emphasis supplied)

(Union brief at p. 18) Accordingly, the question is *not* simply whether Wheeling-Pittsburgh can continue to pay the $21.40 rate required by the current *collective bargaining agreement* and still emerge with enough cash in hand at the expiration of the contract term to meet current operational expenses. The relevant question is whether it is necessary for Wheeling-Pittsburgh to pay the $15.20 rate found in its *proposal* in order to successfully reorganize. The questions are not the same. At the expiration of the collective bargaining agreement, Wheeling-Pittsburgh may emerge with enough cash on hand to meet its current operating expenses; but if a successful reorganization necessitates more cash than that, and if the proposed $15.20 modification is necessary to help generate the additional cash requirements, then the proposed modification is necessary for reorganization. Therefore, the first problem with the Union's characterization of the issue is that it overlooks the fact that in order for the debtor to successfully reorganize, it will be necessary to do more than just emerge from the current labor contract with enough cash on hand to meet current operating expenses.

A related problem with the Union's characterization of the issue is that it focuses on what the debtor does *not* need to do in order to "ride out" the period of the collective bargaining agreement rather than focus on what the debtor *needs* to do in the long run to reach the broader goal of reorganization. The paramount goal in a Chapter 11 proceeding is reorganization of the Company, not preservation of the collective bargaining agreement. Understandably, the Union desires to emerge from this proceeding having preserved the terms and conditions of its collective bargaining agreement. However, if by doing so, the Company is pushed into liquidation, the Union's victory will have been a Pyrrhic one. "[C]ontracts with a liquidated company offer hollow promises." [6] In any event, the proper issue to consider is whether the proposed $15.20 rate is necessary to permit Wheeling-Pittsburgh's reorganization.

 The evidence and testimony support the Company's argument that the $15.20 labor rate is necessary for the Company's reorganization. This $15.20 figure was the product of a calculation predicated on various assumptions relating to Wheeling-Pittsburgh's costs, production volume, price, market share, and capital expenditures over the next five years. The Union contends, however, that the Company's assumptions were unreasonably pessimistic and that the Company will be in a better financial position in five years than it predicts, thereby enabling it to afford a wage rate higher than $15.20. The court does not find credible the Union experts' optimism regarding the steel industry and Wheeling-Pittsburgh's future participation therein. The United States steel industry today is in very critical shape; the price of steel over the last three to five years, adjusted for inflation, has declined; rising steel imports have cut into the domestic steel market despite federal "dumping" laws; steel plant shutdowns are growing more numerous as are steelworker layoffs; and the most optimistic forecasts predict only relatively small market improvements which are not significant when measured against the industry overcapacity.

---

6. 130 Congressional Record S6091 (daily ed. May 21, 1984) (remarks of Senator Hatch).

The foregoing factors help explain this debtor's current plight. Wheeling-Pittsburgh has sustained significant losses over the last three years; the Company is producing steel at only 50%–60% of capacity; the bulk of the Company's cash goes to paying utilities and labor costs (labor costs comprise 35–40% of the Company's total costs); the Company owes $50–$65 million this year for last year's pension fund liabilities; the Company owes approximately $125 million to unsecured creditors, $547 million to secured creditors (the collateral for which may be worth less than $100 million); and a total of $121 to $363 million to pension benefit plans. In view of the foregoing, it cannot be said that the Company's projections were unnecessarily pessimistic. Even if Wheeling-Pittsburgh could significantly reduce its utility and other non-labor costs, (which is doubtful) it is clear that a reduction in labor costs is also necessary if the Company is to have any hope of reorganizing. This Company is in deep financial difficulty; its continued existence is in question; and the $15.20 labor rate, along with other concessions by all parties in interest, is necessary if a reorganization is to be achieved and a liquidation avoided.

Turning to the proposed five year collective bargaining term, the Union concedes that the Company should have a stable labor arrangement at the time it emerges from reorganization. However, the Union argues that a five year agreement is not necessary to achieve this goal since stability can be achieved through a contract of shorter duration. The Union further argues that in any event, it is unnecessary to commence any agreement at the present time to achieve a stable labor cost during reorganization since there will be time enough at the expiration of the current agreement (in 13 months) to negotiate that figure.

Wheeling-Pittsburgh's period of reorganization likely will last *at least* five years. The Company proposal contemplates a 10 year payout of a 50% dividend to over $500 million of general unsecured claims. The court accepts as credible the testimony that with the $15.20 labor rate, the Company would get to a point 5 years out where it is almost a dead break even. This will hopefully allow, but not guarantee, payment on dividends to general creditors. Conceding, as the Union does, that labor stability is necessary during the reorganization period, there is no evidence as to how labor stability can be achieved with a contract of less than five years' duration. Therefore, the court finds that the five year term is necessary for the debtor's reorganization.

The Union next argues that, in any event, it is not necessary to commence any agreement at the present time to achieve a stable labor cost during reorganization since there will be time enough at the expiration of the current agreement (in 13 months) to negotiate a new labor rate. The court has already found that $15.20 is the labor rate necessary for the Company's reorganization. Therefore, there is no need, reason or justification for waiting 13 months for relief from a losing situation, and there are good reasons for commencing relief now. Labor instability threatens the Company's sales volume and customer base. If, as both parties agree, labor stability is necessary to protect sales and customer relations in this reorganization process, then it should be achieved now and not 13 months in the future.

The court finds that the Company has met its burden of proof on this issue and that the proposed modifications are necessary for reorganization.

6. *Proposal Must Treat All Parties Fairly and Equitably.*

■ Having concluded that the proposed modifications are necessary, the next issue is whether the proposed modifications assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

Senator Packwood described the intent of the "fair and equitable" language:

This language guarantees that the focus for cost-cutting must not be directed exclusively at unionized workers. Rather the burden of sacrifices in the reorgani-

zation process will be spread among all affected parties.

130 Congressional Record S8898 (daily ed. June 29, 1984). "Fair and equitable treatment does not of necessity mean identical or equal treatment." *In re Allied Delivery System Co.*, 49 B.R. 700, (Bankr.N.D. Ohio 1985); *In re Carey Transportation,* 50 B.R. 203, 210 (Bankr.S.D.N.Y.1985).

The Union contends that the Company's proposal would impose a disproportionate share of the burden of reorganization on the backs of its employees. In particular, the Union argues that the proposal does not provide for any upward adjustment in the labor rate to ensure that the employees share in whatever benefits may eventuate should the Company do better financially than it has projected. Instead, the Union argues, the employees are relegated to a "substandard" wage rate for five years.

However, the Union produced no evidence to establish the level of a "standard" wage rate, nor to prove that one rate or another is "substandard." It is obvious that $15.20 is far from $21.40 and even farther from $25.00. But the issue before the court relates to costs necessary to achieve a reorganization, not to whether such costs are "standard" or "sub-standard" as measured against some other scale.

It is relevant to note that the proposal also does *not* provide for any downward adjustment below the $15.20 in the event the Company continues to lose money. The steel industry and this Company are in serious financial trouble. It might not be inequitable to ask hourly employees to share in future shortfalls, but that has not been done. In any event, the proposal provides cost stability for the Company, and also provides wage stability for Union workers. .

Creditors, on the other hand, are to be subjected to a 50% loss amounting to losses of some $250 million, with the 50% balance payable over 10 years. This is a significant sacrifice by itself; and if the Company's profitability projections ultimately prove to have been too optimistic, there could be a default in payments to creditors resulting in further losses to them. Therefore, the creditors are sacrificing much for the reorganization of the Company.

The Union further argues that creditors may fare better than employees because creditors may get stock for their claims. But that will likely occur only if there is insufficient money to pay dividends on creditors' claims. If stock is issued as payment for claims, in whole or in part, such claimants will have become involuntary investors in stock of questionable value.

Finally, salaried employees have been without wage increases since about 1981, and took a 10% reduction in 1982, half of which was restored in 1984. The salaried wage structure is below that of the industry generally, and is such that salaried workers leave for better paying jobs elsewhere. The Company has difficulty finding qualified replacements. No further sacrifices in this sector are warranted.

The burden on the Union employees is not disproportionate from the burden on other affected parties. There is no difficulty finding that, under the proposal, the burdens of past losses and future recovery from an unfortunate present financial situation will be shared fairly and equitably among all the parties concerned.

### 7. *Information Necessary to Evaluate the Proposal.*

§ 1113(b)(1)(B) states that:

Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession ... shall ... provide ... the representative of the employees with such relevant information as is necessary to evaluate the proposal.

The Union's argument on this point is twofold: (1) the Company refused to provide the Union and its financial experts with basic information they needed to evaluate the May 9 proposal; and (2) in any event, the three weeks between the date on which the proposal was submitted and the date on which the Company filed its motion to reject was too short a period in which to evaluate the proposal.

In response to the Union's first argument, the Company argues that the Union was intimately familiar with the Company's financial condition prior to the Company's chapter 11 filing. In particular, the Company argues that it has provided the Union with Company financial information repeatedly since 1982 to enable the Union's experts to evaluate the Company's requests for concessions over the years. This raises this issue of whether the court may consider relevant information that the debtor gave to the Union prior to filing its chapter 11 petition; or must the court only consider information which the debtor conveyed to the Union "subsequent to filing a petition and prior to filing an application seeking rejection" as the statute literally states.

■■■ Consistent with the general policy behind § 1113, the purpose of providing the Union with relevant information sufficient to evaluate the proposal is to facilitate voluntary modifications in the collective bargaining agreement before a motion for rejection is filed. *See* 130 Congressional Record S8898 (daily ed. June 29, 1984, remarks of Senator Packwood: "[§ 1113] places the primary focus on the private collective bargaining process and not on the courts"). *See also Id.* : The intent of the new law is to "encourage[ ] the parties to solve their mutual problems through the collective bargaining process." [Remarks of Senator Kennedy]. It should not matter that information which is relevant to evaluating the proposal was furnished prior to the debtor's filing of its chapter 11 petition. Therefore, a court may properly consider this information in determining whether the Company had provided to the Union sufficient information to evaluate the proposal.[7]

■■■ On January 11, 1985, Arthur Young & Company, an accounting firm engaged by the Union, completed an intensive five week financial analysis of the Company culminating in a 27 page report. The

Union had, in early 1983, taken a wage reduction, which by agreement was to be fully restored at the end of December 1984. The restorations would increase the hourly rate from $21.40 to $25.00 (an increase of $3.60 per hour). At 1,000,000 work hours per month for the remaining 18 months of the labor agreement, this amounted to approximately $64 million. The Company requested deferral of this restoration, and the purpose of the Arthur Young study was to enable the Union to respond to the Company's request for this $64 million concession.

The Arthur Young report is illuminating. It appears to be an exhaustive analysis. It states in part (W–P Exh. 10, p. 8):

> In order for this company to survive, there are at least five things that must transpire ... Even with these various changes, it may still be impossible for the Company to survive the steel depression of the 1980s.

Wheeling-Pittsburgh personnel and Arthur Young personnel worked together for days, nights, and weekends to compile the report. At no time did anyone from Arthur Young suggest that Wheeling-Pittsburgh did not provide enough information for the analysis. Nowhere in Arthur Young's report does the author complain that information was held back, or that he was restricted or limited in his access to information necessary to his evaluation.

In addition, Lazard-Freres, at the Union's request, evaluated the Company's March 8, 1985 restructuring proposal, the so-called "three-legged stool." During the three week period of analysis, the parties had many meetings and worked closely together. There was no evidence that Lazard-Freres was not given access to all information requested.

The above cooperative efforts are the culmination of several years of information sharing necessitated by the financial weak-

---

7. Similarly, the question arises as to whether a court may properly consider information furnished by the debtor *after* the debtor files its motion to reject but *before* the expiration of the § 1113 hearing. However, this question need

not be resolved today since the information furnished by the debtor prior to the filing of its motion to reject was sufficient to enable the Union to evaluate the proposal.

ness of the Company. Therefore, when the proposal of May 9, 1985 was submitted by the Company, the Union already possessed a wealth of detailed information about the Company and its finances.

Arthur Young and Lazard-Freres on behalf of the Union assert that the January 1985 analysis and the March 1985 analysis were different than the type of analysis necessary to evaluate the May 9, 1985 proposal. The May 9 proposal, they argue, required a different analysis because the proposed cuts were deeper and longer lasting. Their protestations are not persuasive. The January report was a study contemplating $64 million in wage deferrals over an 18 month period. That amount is not far different from the $80 million over 13 months here in question. It is recognized that this $80 million in contract wage cut-backs comes in addition to the $64 million, alluded to earlier, and that a $6.20 cut-back under the proposal over a *five* year period would amount to some $372 million. However, the fundamental objective of all the Union's financial analyses over the years was to ascertain the financial health of Wheeling-Pittsburgh. Apparently, their efforts were successful since the Union felt comfortable enough with the financial experts' conclusions to make decisions regarding concessions.

In addition to the extensive amount of information which the Company provided the Union prior to the issuance of the May 9 proposal, the Company provided the Union with substantial amounts of information immediately following its submission of the May 9 proposal. Counsel for the Union in fact admitted in his opening statements at the hearing that the Company immediately supplied "reams of information" to the Union experts. [T. 6/17 at p. 34] Extensive additional information was thereafter provided.

Moreover, the Union experts' contention that they had insufficient information to evaluate the May 9 proposal is weakened by their introduction of numerous detailed exhibits which contained calculations and forecasts aimed at discrediting the Company's proposal. Their documents and testimony establish that they had sufficient information to evaluate the Company's May 9 proposal.

The Union next argues that there was insufficient time to evaluate the Company's proposal. Mr. Scouler, an insolvency specialist with the accounting firm, Arthur Young, testified for the Union that he needed at least a month, working seven days a week, to evaluate the necessity of the Company's proposal. In the same vein, Mr. Supino, an investment banker with Lazard-Freres, testified for the Union that his analysis of the proposal normally would take approximately two months. On this point, the Company's financial expert, Mr. Sakellariadis, testified that "we can analyze this company for two years if we wanted. But it might not be around at the end of two years." [T. 6/18, p. 118].

The court finds the Union's lack of time argument unpersuasive. Nothing in Section 1113 says that the Union must be given a certain period of time to evaluate the information given by the Company. Section 1113(b)(1)(B) only states that the Company must provide the Union with such relevant information as is necessary to evaluate the proposal.

Mr. Sakellariadis' testimony points up the realities of the situation. Obviously, it would be desirable to be able to give the Union financial experts a month or two to evaluate every facet of the Company's financial health. Even then, reasonable experts could differ as to the conclusions drawn. However, there simply is not the time during a Chapter 11 proceeding in general and a § 1113 scenario in particular, to do a completely exhaustive financial analysis. The parties must make critical, and often costly, decisions in a short period of time as best they can, and then move forward. Three weeks was sufficient time in this emergent situation. Also, as noted earlier, the Union has been following and analyzing the Company's financial position very closely for years. It did not start from ground zero on May 9. Therefore, this court finds that the Union had such information and time as was necessary to evaluate the debtor's proposal.

8. *Good Cause.*

██ Next, it is necessary to determine whether the Union has refused to accept the Company's proposal without good cause. Having found that Wheeling-Pittsburgh submitted a proposal which was based on the most complete and reliable information available at the time of its creation, contained only necessary modifications, and treated all affected parties fairly and equitably; and having further found that the Company met at reasonable times with the Union, conferred in good faith, and provided the Union with such relevant information as was necessary to evaluate the proposal, the court is constrained by logic to find that the Union rejected the Company's proposal without good cause. *See* Gibson at 341 ("If the requirements of section 1113(b)(1) have been met, and the proposal contains nothing but modifications of the contract which are necessary for the survival of the firm, and all affected parties are being asked to sacrifice equally, it is difficult to believe that a bankruptcy court would find any cause good enough to justify rejection.") Senator Packwood is in agreement on this point: "In practical terms, this [good cause] language imposes no barrier to rejection if the debtor's proposal has contained only the specified 'necessary' modifications." Congressional Record S8898 (daily ed. June 29, 1984). Accordingly, the court finds that the Company has met its burden of proof on this issue.

9. *The Balance of the Equities Clearly Favors Rejection.*

The final issue to be resolved is whether the balance of the equities clearly favors rejection of the collective bargaining agreement. Note that up to now, the focus has been on the Company's proposal. Now the focus is on the collective bargaining agreement currently in force.

The "balance of the equities" test is a statutory codification of the standard for rejection espoused by the Supreme Court in *N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). *In re Carey Transportation, Inc.,* 50 B.R. 203, 212 (Bankr.S.D.N.Y.1985); *In re Salt Creek Freightways,* 47 B.R. 835, 841 (1985). *See also* Gibson at 343. In striking the balance in this test, the Supreme Court stated:

> The Bankruptcy Court is a court of equity, and in making this determination, it is in a very real sense balancing the equities, as the Court of Appeals suggested. Nevertheless, the Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities. The Bankruptcy Code does not authorize free-wheeling consideration of every conceivable equity, but rather how the equities relate to the success of the reorganization ... the Bankruptcy Court must consider the likelihood and consequences of liquidation for the debtor absent rejection, the reduced value of the creditors' claims that would follow from affirmance and the hardship that would impose on them, and the impact of rejection on the employees. In striking the balance, the Bankruptcy Court must consider not only the degree of hardship faced by each party, but also any qualitative differences between the types of hardship each may face.

*N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984).

██ As the Supreme Court has stated, in balancing the equities, the Bankruptcy Court must focus on the ultimate goal of chapter 11. This goal is reorganization. The primary question when balancing the equities is the effect of rejection of the collective bargaining agreements on the Company's prospects for reorganization.

██ Rejection of the Company's collective bargaining agreements will have a significant and positive effect on Wheeling-Pittsburgh's prospects for reorganization. Wheeling-Pittsburgh is in this bankruptcy proceeding because of substantial and continuing losses. These losses appear to be the result of weak demand, weakening prices, foreign competition, and an excess of industry-wide capacity as compared with demand. There is very little the Company can do to reduce non-labor costs. The result is that either the labor costs are re-

duced or the losses will continue. Present labor costs are simply above the Company's ability to pay. This situation of financial distress is not the fault of either party. But the inescapable fact is that the continuing losses must be stopped if the Company is to reorganize.

The financial direction of the Company must be reversed. The next step downward after chapter 11 is liquidation. The effect of liquidation would be disastrous for all parties. Jobs and wages would be lost and creditors would take losses in additional millions of dollars; stockholders would lose any interest which a reorganization might provide for them.

The Union's argument that, given bankruptcy law protection from creditors, Company assets can and should be dissipated until July 31, 1986, and then, at that time, a new labor contract can be negotiated at reduced rates which *will* allow reorganization, is rejected as unfair and inequitable. It is not the duty of this court to supervise, under its protective umbrella, the liquidation of a debtor's assets for the benefit of one group of interested parties at the expense of the others.

The court is not unmindful that rejection will entail short term sacrifice on the part of employees, but in the long run, they will benefit by a successful reorganization and a stable wage rate. That is far better than a liquidation.

It would seem that the above conclusions are inescapable. The controlling facts are not difficult to comprehend and lead necessarily to the conclusion that the labor agreement must be rejected and renegotiated. It is apparent, and all parties must recognize, that the steel industry is in deep financial trouble, that this Company is in deep financial trouble, that the overcapacity in the industry may force some steel producers out of business, and that this Company may be forced into liquidation in the competitive process of reducing industry-wide capacity.

The parties recognize that this is a collective bargaining dispute and that this court, as a place for resolving a collective bargaining dispute, is not the proper forum.

The real decisions must be made at the bargaining table. If Wheeling-Pittsburgh is to be saved and not liquidated, the Union and the Company (representing not only management and shareholders, but also bargaining on behalf of creditors—because the Company must later deal with creditors) must work out a solution at the bargaining table taking into consideration the hard realities that face them economically. This court cannot compel, but it can and does encourage the parties to continue negotiations to reach a solution, without with which the likelihood of liquidation is very real.

### Conclusion

For the foregoing reasons, the debtor's motion will be granted by separate order.