**In the Matter of SOL–SIEFF PRODUCE COMPANY, Debtor.**

**Bankruptcy No. 87–3175.**
**Motion No. 88–230.**

United States Bankruptcy Court,
W.D. Pennsylvania.

Feb. 22, 1988.

John I. Nubani, Pittsburgh, Pa., for the Debtor.

Harry R. Beeson, Uniontown, Pa., for the Union.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court is the Debtor's Application to Reject a Collective Bargaining Agreement, negotiated with the Chauffeurs, Teamsters & Helpers Local Union No. 491 ("Union"), which it deems necessary to its reorganization. The Union contests the application as being wholly unnecessary and inequitable. A hearing on the issues was held on January 25, 1988, at which time exhibits were offered and testimony was taken. The parties have submitted briefs and have rested their cases. Based upon the totality of the information presented and analyzed by the Court, it appears necessary that Debtor's application to reject be granted.

## FACTS

Debtor is a wholesale produce distributor which has been in existence under various owners since 1915. The present owner ("Fazio") purchased the business as a partnership venture in December, 1985. The purchase price was $715,000.00, with each of the two (2) partners investing $150,000.00 in cash. The remainder of the purchase price is owed to the previous owners with a payment approximating $9,800.00 per month through July, 1989.[1]

In May, 1986 Debtor purchased the assets of another wholesale produce distributor in a neighboring city. After several proddings by the Union, the employees of said distributor were brought under the Debtor's Collective Bargaining Agreement.

Fazio bought the other half of the business from his partner in July, 1986, paying said partner $150,000.00 in cash, providing a $15,000.00 debt forgiveness, and assuming full liability on the outstanding payments to the previous owners.

Debtor's financial troubles began in November, 1986. At that time Fazio met with his employees to advise them of the company's difficulties, and requested that they discuss early renegotiations with their Union representative.

In late March or early April 1987, Fazio approached the recently appointed Union representative ("Peffer") to ask for concessionary assistance; Fazio showed Peffer the Company's financial data as evidence of its economic problems and provided for Peffer to have full access to his accountant for future data. Conditions grew worse, with the Debtor showing minimal profit as the summer approached,[2] and in July 1987 Debtor was forced to close the second distribution center, merging those efforts into the original operation. Again Fazio approached Peffer, both to discuss conces-

---

1. The employees of this operation were under Union contract when the business was purchased and have so remained.

2. Summer constitutes the best season in Debtor's business year.

sions and provide financial data.[3]

The first concrete discussions of concessions occurred in early October 1987, when Debtor provided specific examples of the type of concessions he sought, i.e. removal of the "8–hour–day" and "44–hour–week" guarantees. These items were again discussed in a meeting between Fazio and Peffer on October 22, 1987.

Between October 22 and November 2, some unclear set of circumstances prompted Fazio to provide Peffer with a more extensive and concrete written proposal for concessions, which included reductions in wages and benefits, as well as cessation of day and week guarantees. The Union membership met to discuss these proposals and unanimously rejected same. No counterproposal was offered.

Having been unsuccessful in personally resolving his company's financial adversities, Fazio hired an outside labor negotiator ("Botta") to handle all further meetings and discussions. Beginning on November 5, 1987, Botta and Peffer had significant contact, through telephone conversations, written correspondence and meetings. Unfortunately, these communications were generally fruitless. Botta provided Peffer with all available relevant financial data, and again advised Peffer that he had complete access to all records held by the Debtor's accountant. At that time Botta requested substantial information from Peffer regarding the various benefits included in the collective bargaining agreement. Some of these items, such as pension plan booklets, were forwarded quickly; however, said booklets were dated 1976, and included no amendments or supplements of any kind. Some of the information was requested several times, from several different Union officials, but was never submitted. Still other information was received either immediately before the appli-

cation to reject was filed with the Court, or thereafter. At one point Fazio met with his Union employees, not to negotiate, but to explain, through written handouts, the contract costs as compared with the company's financial instability, and to plead with the workers to encourage action by Peffer.

The Union's response to some of the correspondence was less than optimum. At several points Peffer threatened to strike due to delinquent pension payments. Some calls and letters from Botta brought no response at all.

By this time Fazio had injected additional capital of over $220,000.00, in order to pay the company's operating expenses. Finally, having already invested over $500,000.00 of his own funds, and having no further access to capital, Fazio filed the Debtor's Chapter 11 petition on November 23, 1987.

Initially the Union questioned the truth of the filing. Shortly after receiving verification, Peffer responded by advising Botta that he would be out of town for six (6) days and that no replacement negotiator would be available. No contact occurred between the parties from December 7–18, at which time Botta sent a certified letter to Peffer requesting a meeting. A meeting was held on December 28, 1987, at which time Botta repeated his requests for information and was again advised by Peffer that the information would be forthcoming. The parties also used this time for substantial pension discussions. However, no actual progress occurred.

By January 4, 1988, when no information had yet been received, the Debtor took the available information[4] and worked it into a proposal, immediately delivering same to Peffer. The contract levels of payment and the proposed changes break down as follows:

---

**3.** Fazio and Peffer dispute the issue of continued contact through September: the Debtor asserts weekly attempts to contact Peffer with no response, and Peffer contends no contact from the Debtor until October. Regardless, no specific proposals were made by either party during said period of time.

**4.** The company did not yet have the November and December financial statements.

| | 1988 | Proposal |
|------------------|--------------|--------------|
| Employee Wages | $ 164,837.92 | $112,320.00 |
| Health & Welfare | 25,920.00 | 17,280.00 |
| Pension Fund | 22,914.36 | 17,280.00 |
| Holiday Leave | 4,705.92 | 2,592.00 |
| Sick Leave | 4,117.68 | 864.00 |
| Total | $ 222,495.88 | $150,336.00 |
| | or | or |
| | $12.36/hour | $8.35/hour |

These amounts constitute a total reduction of 32.4%. Other proposed changes having to do with seniority and contract labor have been excluded. While the Court expects that some economic value was placed on these modifications, their worth has not been expressed; therefore, we do not consider them part of the contract proposal.

Debtor provided its proposal based upon the following financial data: [5]

Period dated 12/26/86 – 10/24/87

| Net Sales | | $3,700,000.00 |
|-------------------------------|--------------|---------------|
| Gross Margin | | 540,200.00 |
| Other Income[6] | | 8,100.00 |
| | | 548,300.00 |
| Operating Costs | | |
| Wages[7] | −100,300.00 | |
| Other[8] | −225,000.00 | |
| Administrative Costs[9] | − 75,700.00 | |
| Other Expenses[10] | −103,000.00 | |
| Union Wages[11] | −135,000.00 | |
| Total Costs | | −639,000.00 |
| Total Actual Loss | | $ (90,700.00) |

Fazio sought and received concessions from the other affected parties. His non-union employees took wage cuts from $350.00 to $250.00 per week, a drop of 28.5%. These employees were also required to extend their hours to include longer days and a 7–day week. The previous owners agreed to a fifty (50%) percent reduction in their monthly payments of $4,900.00, with a balloon payment upon the due date of July 1, 1989.[12] Early in 1987 Fazio had been taking a reduced weekly salary of $250.00 from $350.00, but by summer he had ceased collecting a paycheck altogether—his total salary for 1987 was $8,300.00. Fazio received no dividend or return on investment whatsoever.

Debtor's business is heavily regulated due to its perishable inventory and substantial consumer connection. The Department of Agriculture has set rules to ensure prompt payments between distributors and their broker/suppliers.

Specifically the Department requires distributors to pay for merchandise within twenty-one (21) days of receipt. Brokers who have not received payment within said time may file claims with the Department, which will advise all other area brokers that the distributor is not creditworthy. Furthermore, the Department has the authority to revoke the distributor's license, effectively putting said distributor out of business.

## ANALYSIS

"Union" and "management" have locked horns on every conceivable issue of labor relations since the strange partnership came into existence. However, none has raised furor and terror to compare with the conflict over rejection of collective bargaining agreements in business reorganization proceedings. Through the years, finding a common ground for the Bankruptcy Code and the National Labor Relations Act has been difficult at best.

Prior to the enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"), a debtor-in-possession could easily eliminate the benefits which were negotiated for the employees by the union representatives. In *NLRB v. Bildis-*

---

5. These figures are rounded to the nearest hundred dollars.

6. Interest; Bad Debt Recovery.

7. Non Union only—includes only $8,300.00 for Mr. Fazio.

8. Bad Debt; Insurance; Benefit package and Pension, including Union; Taxes.

9. Advertising; Legal; Accounting; Rent; Utilities; Licenses; Taxes.

10. Debt Service to previous owners.

11. Actually paid during 10 month period.

12. The previous owners also agreed to extend the payment term if the Debtor required such additional assistance.

*co & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), the Supreme Court held that a collective bargaining agreement constitutes an executory contract which may be rejected by a debtor-in-possession under § 365(a) of the Bankruptcy Code, but that the standard for rejection should be somewhat higher than the "business judgment" standard governing traditional executory contracts. *Bildisco* also permitted unilateral modification of collective bargaining agreements—an activity expressly prohibited by the federal labor laws.

To a large extent because of this inequity, Congress enacted BAFJA, requiring bankruptcy courts to follow specific guidelines before permitting a debtor-in-possession to reject a collective bargaining agreement. Section 1113 of the Bankruptcy Code states in pertinent part:

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The Court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

The first case to be decided and reported after the passage of BAFJA was *In re American Provision Co.*, 44 B.R. 907 (Bankr.D.Minn.1984). Bankruptcy Judge Kressel considered § 1113 to be less than masterful draftsmanship; however, from that section he created a nine-point test for determining the propriety of rejecting a collective bargaining agreement. This test was acknowledged by our Circuit in *Wheeling–Pittsburgh Steel Corporation v. United Steelworkers of America*, 791 F.2d 1074, 1080 (3d Cir.1986), and requires the following:

1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.

2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.

7. At the meetings the debtor must confer in good faith in attempting to reach

mutually satisfactory modifications of the collective bargaining agreement.

8. The Union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement.

*In re Wheeling Pittsburgh Steel Corporation,* 50 B.R. 969 (Bankr.W.D.Pa.1985) was the first major decision after the enactment of BAFJA. Judge Bentz, in the very short time allotted him to hear the testimony and render a written Opinion and Order, skillfully and carefully outlined the nine-point analysis, meticulously scrutinizing all points, even those over which there appeared to be no disagreement. The Court found that rejection was appropriate, stating that if the agreement was upheld, but the company was forced to liquidate, the contract would "offer hollow promises". *See* 50 B.R. at 978, quoting 130 Cong.Rec. S6091 (daily ed. May 21, 1984) (remarks of Senator Hatch).

In allowing the rejection, the Bankruptcy Court enunciated the critical factor, when it stated:

> The parties recognize that this is a collective bargaining dispute and that this court, as a place for resolving a collective bargaining dispute, is not the proper forum.
>
> *The real decisions must be made at the bargaining table.* (Emphasis added).

*See* 50 B.R. 984.

On appeal to the District Court, the Union raised several specific issues, regarding the necessity of the modifications, the fairness and equity in the treatment of the parties, and the good faith of the Debtor's negotiations. In affirming the Bankruptcy Court's decision, Judge Mencer provided a remarkable extended metaphor, most appropriately repeated here:

> The Company and Union are both in the same boat faced with a serious and common problem that may well sink all who are aboard, including the equity holders and lenders ... The response needed is for all to bail water, pull together, throw overboard that portion of the heavy cargo that can be sacrificed, head for safe ground and try to weather the storm with the hope that all will not be lost.

*See* 52 B.R. 997, 1004 (W.D.Pa.1985).

The appeal to the Third Circuit concentrated on three specific issues [13]:

1) were the proposed modifications necessary;

2) did this proposal treat all parties fairly and equitably; and

3) did the Debtor negotiate with the Union in good faith.

In discussing "necessary" as it applies to the proposed modifications, Judge Sloviter noted that the statute did not define "necessary"; and therefore turned to the available legislative history. After examining the various amendments offered by several Congressmen, the Court found that:

> The congressional consensus ... requires that "necessity" be construed strictly to signify only modifications that the trustee is constrained to accept because they are directly related to the company's financial condition and its reorganization.

*See* 791 F.2d at 1088.

The language of the amendment was derived from the proposal of Senator Packwood, who explained his reasoning as follows:

> Only modifications which are necessary to a successful reorganization may be proposed. Therefore, the debtor will not be able to exploit the bankruptcy procedure to rid itself of unwanted features of the labor agreement that have no relation to its financial condition and its reor-

---

13. Since the decision in *Wheeling Pittsburgh,* other Courts have taken positions at variance with the Third Circuit's view, *See Truck Driver's Local 807 v. Carey Transportation Inc.,* 816 F.2d 82 (2d Cir.1987); *In re Century Brass Products Inc.,* 795 F.2d 265 (2d Cir), *cert denied,* —— U.S.

——, 107 S.Ct. 433, 93 L.Ed. 383 (1986); *In re Amherst Sparkle Market Inc.,* 75 B.R. 847 (Bankr.N.D.Ohio 1987); *In re Royal Composing Room,* 62 B.R. 403 (Bankr.SDNY 1986). This Court is bound by the Third Circuit's decision.

ganization and which earlier were agreed to by the debtor.

130 Cong.Rec. S8898 (daily ed. June 29, 1984), quoted at 791 F.2d 1088.

The Third Circuit further found that the necessity should relate to the present tense goal of avoiding liquidation rather than the future contemplation of the debtor's emergence from reorganization as a "whole" company. Specifically, Judge Sloviter stated:

While we do not suggest that the general long-term viability of the company is not a goal of the debtor's reorganization, it appears from the legislators' remarks that they placed the emphasis in determining whether and what modifications should be made to a negotiated collective bargaining agreement on the somewhat shorter term goal of preventing the debtor's liquidation, the mirror image of what is "necessary to permit the reorganization of the debtor".

*See* 791 F.2d at 1089.

In looking to the fair and equitable treatment of all affected parties, the Court again referred to the legislative history, which states in pertinent part:

... where the trustee seeks to repudiate a collective bargaining agreement, the covered employees do not bear either the entire financial burden of making the reorganization work or a disproportionate share of that burden.

130 Cong.Rec. H7496 (daily ed. June 29, 1984) (remarks of Congressman Morrison).

... guarantees that the focus for cost cutting must not be directed exclusively at unionized workers. Rather the burden of sacrifices in the reorganization process will be spread among all affected parties.

130 Cong.Rec. S8898 (daily ed. June 29, 1984) (remarks of Senator Packwood).

Thus, Judge Sloviter held that the benefits and burdens of the affected parties must be compared and contrasted "... from a realistic viewpoint and on the basis of record evidence". 791 F.2d at 1093.

Finally, in discussing the good faith or lack thereof exhibited by the Debtor, the Third Circuit drew two conclusions. First, in discussing the need for supplying the relevant information necessary to evaluate the proposal, Judge Sloviter said:

The purpose of the requirement ... was intended to encourage negotiation between the Company and the Union rather than permit a unilateral repudiation.

*See* 791 F.2d at 1093.

Additionally, the Court stated that the amount of time allotted for negotiation between the offer of proposed modifications and the application to reject will depend on the various individual circumstances of each case, but that "... the need for haste in itself cannot support the finding that [the debtor] met its obligation." 791 F.2d at 1093–4.

## APPLICATION

Having examined the facts of the present case and the analysis under which we are to proceed, we now examine the Debtor's application in light of the nine-point test of *American Provision, supra.*

1. There is no dispute but that Debtor submitted its written proposal on January 4, 1988, outlining all of the proposed modifications to the collective bargaining agreement presently in effect. This proposal was submitted after the bankruptcy filing and prior to the filing of the Application to Reject.

2. The proposal was based upon the Debtor's financial information up through October, 1987, which was the most complete and reliable information available at the time the proposal was drafted. When the Debtor's November and December financial statements were available, Botta incorporated them into the negotiations. Unfortunately, the Union did not provide all of the information which he requested, and that which was provided was old. In some instances Botta was unable to verify its accuracy. Nevertheless, he used all of the available, reliable information to create the proposal.

3. The proposed modifications are necessary to permit the Debtor's reorganization. To this time, Fazio has been able to

maintain the *status quo* through major capital investments. He is no longer able to do so. Without the economic reductions, requested in Debtor's proposal, Debtor will have no choice but to liquidate. The Union will have a contract in force, and nine (9) unemployed members. While we understand that the Union wants to negotiate the best possible deal for its members, it cannot possibly wish to leave them jobless. Fazio has provided a constant flow of new funds, but the well is running dry. We are faced with a clear case of reduction or liquidation. The modifications to wages and benefits are *essential* to the Debtor's continued existence.

4. Based upon the information presented, the affected parties are being treated fairly and equitably. *Fair and equitable* does not mean *equal* in all respects. Under the proposal, the Union workers would be receiving a combined wage and benefit package costing $8.35 per hour. The nonunion workers are presently receiving substantially less: at 40 hours per week, they earn $6.25 per hour, down from $8.75 which they received before they agreed to wage reductions. However, Fazio testified that these employees now work longer days and weeks, giving them an hourly wage closer to $4.00.

Fazio received only $8,300.00 in salary last year, and has taken no paycheck for several months. He takes no return on investment, and he has injected over $220,000.00 in working capital since August of 1986. Most of his life savings has been invested in and evaporated through the Debtor—he has no more to give.

The previous owners have agreed to a 50% reduction in present payments and have agreed to extend the payment period past July 1, 1989 if it is deemed necessary. Due to the Debtor's dire financial predicament, it is very necessary for such an extension to be offered. The reduction in monthly payments, coupled with the extension of the time for repayment will assure that the previous owners are treated fairly and equitably in relation to the other affected parties.

The creditors in this case pose a unique problem. As stated previously, the produce business is closely regulated by the Department of Agriculture, requiring distributors to pay their broker accounts within twenty-one (21) days of merchandise receipt, or face the possibility of license revocation. Debtor has been able to extend the twenty-one (21) day period with several brokers. Several have given the Debtor as much as forty-five (45) days to pay for merchandise. However, with the bankruptcy filing, some brokers have put the Debtor on C.O.D. payments; some have demanded payment before loading; and still others have refused to do business at all. Debtor's business does not provide the luxury of stockpiling inventory. Without broker support, Debtor will lose its federal licensure. Without that license, Debtor is out of business. The brokers have been giving the Debtor grace periods and extensions. There is nothing more they can give.

The affected parties are being treated fairly and equitably.

5. From the outset, Debtor, through Fazio and Botta, has provided the Union with every piece of financial information available so that the Union might evaluate the Debtor's financial position and proposed modifications. The Debtor's accountant was instructed to make all financial data available to the Union; to "hold nothing back." As financial statements were completed, they were shown and/or sent to Peffer. On one occasion, Fazio gave the raw handwritten data to Peffer, because the typed report was not yet completed. There was never a Union request for information that was denied or ignored.

6. Efforts were made to meet with Peffer to negotiate over the proposed modifications. After the Debtor submitted its proposed modifications, it received a letter from Peffer stating that the Union refused to negotiate and that the contract would not be reopened prior to the normal negotiation period. Seeing no possibility of negotiating after Peffer's refusal, Debtor filed its Application to Reject the Collective Bargaining Agreement, on January 12, 1988.

It is unclear what attempts were made to negotiate the proposed modifications after the application to reject was filed. Debtor took the position that the Union's letter indicated absolutely no room for negotiation whatsoever.

Apparently at some point after the application was filed, Peffer became aware of the need to negotiate. By letter dated January 20, 1988 Peffer advised Botta that he had called a Union meeting and submitted the proposal; same had been rejected unanimously. While advising that he was available for further negotiations and meetings, he offered no explanation for the rejection nor any counterproposals from which the Debtor could operate. Five days later, on the morning of the scheduled hearing, the parties finally met to discuss the proposals, and were unable to reach any mutually acceptable terms.

7. This Court does not question the Debtor's good faith in these negotiations. Debtor has at all times been ready, willing, and able to negotiate these issues.

8. As early as January 6, 1988 the Union, absolutely and without reservation, rejected the Debtor's proposed modifications, indicating that no modifications whatsoever would be considered. As no changes were acceptable, no counterproposals were submitted.

Again on January 19, 1988 the Union employees unanimously rejected the proposed modifications. While Peffer's follow-up letter to Botta indicates for the first time a willingness to negotiate, there is no explanation for the rejection, nor any suggested changes or counterproposals. From all clear indications, the Union has rejected the proposal without good cause.

9. The balance of the equities in this case favors rejection of the collective bargaining agreement, for it is apparent to this Court that absent said rejection, this Debtor will fold. There is no guarantee that even these modifications, along with the concessions of the other affected parties, will be sufficient to stop a liquidation at some later date. Yet, it is also possible that a change in circumstances will bring the Debtor back to financial strength. The Union can rightfully expect to negotiate a contract providing it a slice of the "good fortune" pie when it arrives. At the present time, however, liquidation is a certainty absent rejection.

Saving the company will require the Union employees to negotiate a presently less attractive contract, but in this seriously depressed economy, their decreased wage and benefit package is substantially more attractive than the sums doled out in the unemployment line. If the affected parties all work together, they may be able to resuscitate the Debtor; if they will not unify their efforts, they will bury it.

An appropriate order will be issued.